IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MARSHALETTE CLARK,**
**ON BEHALF OF K.C.,**                                              Case No. 1:15 CV 2148
            Plaintiff,

            v.                                                                    Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

            Defendant.                                                  MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Marshalette Clark ("Clark") filed a Complaint against the Commissioner of Social Security ("Commissioner") on behalf of her daughter, K.C. ("Plaintiff"), seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 16). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Clark filed an application for SSI on behalf of her daughter on July 9, 2012, alleging a disability onset date of June 7, 2012. (Tr. 133-38). The claims were denied initially and upon reconsideration. (Tr. 100-02, 106-08). Clark then requested a hearing before an administrative law judge ("ALJ"). (Tr. 109-11). On September 13, 2013, Plaintiff and Clark appeared and testified in Cleveland, Ohio, at a hearing before the ALJ. (Tr. 36-77). After being informed of her rights, Clark opted to proceed without a representative. (Tr. 78). On June 6, 2014, the ALJ found Plaintiff not disabled in a written decision. (Tr. 17-32). The Appeals Council denied

Clark's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); 20 C.F.R. §§ 404.955, 404.981. Clark filed the instant action on behalf of Plaintiff on October 16, 2015. (Doc. 1).

## FACTUAL BACKGROUND

### *Medical Records*

In June 2012, Clark brought Plaintiff to MetroHealth Medical Center pediatrician Tatiana Gurevich-Panigrahi, M.D., to address behavioral difficulties. (Tr. 375). She reported Plaintiff was in preschool and able to learn new things, but was disruptive, had difficulty following directions, and sometimes hurt other children. *Id.* Clark reported Plaintiff continued to wet the bed at night and have accidents at school. *Id.* Dr. Gurevich-Panigrahi administered a Vanderbilt test, which was consistent with attention deficit hyperactivity disorder ("ADHD"), but wanted to wait for a response from Plaintiff's teacher. (Tr. 376). She later noted the teacher's response was consistent with ADHD for inattention, hyperactivity, and impulsivity. (Tr. 369).

In July 2012, Clark took Plaintiff to see MetroHealth Medical Center pediatrician Robert Needlman, M.D., about "social and emotional problems as well as bad behaviors" at home and school. (Tr. 366-67). Clark reported Plaintiff had witnessed domestic violence and thought that might be a contributing factor. (Tr. 366). Later in July, Dr. Gurevich-Panigrahi referred Plaintiff to a behavioral specialist, noting impulse control problems. (Tr. 369-70).

In late July 2012, Plaintiff underwent a mental health assessment at Beech Brook Counseling Center due to extreme tantrums, aggressiveness with peers, wetting herself, and disruptive school behavior. (Tr. 168). Plaintiff was diagnosed with disruptive behavior disorder, not otherwise specified. (Tr. 179). She was also given a secondary diagnosis of post-traumatic stress disorder ("PTSD") due to her exposure to domestic violence, parental incarceration, and

2

parental mental illness. *Id.* She was assigned a Global Assessment of Functioning (GAF) score of 43[1], and individual behavioral health counseling and therapy were suggested. (Tr. 178-79).

In November 2013, Courtney Gotshall at OhioGuidestone administered an Early Childhood Mental Health Assessment. (Tr. 410-20). She noted Plaintiff had difficulty expressing emotions appropriately and had been suspended for being physically aggressive toward other children. (Tr. 410). Ms. Gotshall stated Plaintiff would benefit from individual mental health services to explore and process emotions associated with past trauma as well as help develop skills to express emotions appropriately. (Tr. 420). Ms. Gotshall indicated Plaintiff's symptoms were "moderate." *Id.*

Over the course of two sessions in February and March 2014, psychologist Amie Paradine, Psy.D., evaluated Plaintiff. (Tr. 424-35). Dr. Paradine noted Plaintiff was cooperative during the first session, but during the second she "did not want to perform on tasks, wanted chocolates, and ran out of the room on three occasions." (Tr. 425). She was careless and rushed through tasks, and went under the table on several occasions. *Id.* She made faces at her mother when she disagreed with her mother's statements, and "appeared angry" when her mother "reported her misbehaviors." (Tr. 426).

Plaintiff scored in the average to low average range on a Full Scale Intelligence Quotient test. *Id.* Her verbal reasoning abilities were in the low average range, but her expressive word knowledge, vocabulary, and ability to understand situations and provide answers to specific problems related to social comprehension were age appropriate. *Id.* Plaintiff also scored in the

---

1. A GAF score represents "the clinician's judgment of the individual's overall level of functioning." Am. Psych. Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed., text rev .2000). A GAF score of 41-50 indicates "serious" symptoms or difficulty functioning. *Id.*

low average range in perceptual reasoning. *Id.* Plaintiff's working memory—the ability "to sustain attention, concentrate, and exert mental control"—was in the average range, though she needed to be told often to pay attention during the task. *Id.* Plaintiff also scored in the average range on the processing speed index—the ability to quickly and accurately scan, sequence, and discriminate simple visual information. (Tr. 426-27). Plaintiff's ability to control her impulses was below average and Dr. Paradine noted she "appears to be struggling with executive functioning, particularly related to her ability to inhibit and self-monitor." (Tr. 427-28). In summary, Dr. Paradine stated Plaintiff's evaluation suggested her deficits were related to her ADHD. (Tr. 431). She recommended continued individual therapy and consultation with a psychiatrist to determine if a medication regimen would be appropriate. (Tr. 431-32). Dr. Paradine also suggested techniques for caregivers and academic providers. (Tr. 433-34).

In May 2014, Clark took Plaintiff to OhioGuidestone. (Tr. 407). Clark reported Plaintiff was "hyper" and had problems at home and at school. *Id.* It was noted Plaintiff was being seen by an OhioGuidestone therapist weekly.[2] *Id.* Incidents of being suspended for arguing with another child and kicking another child who was sleeping were noted. *Id.* Nurse Practitioner Lashelle Henderson assessed ADHD, anxiety, Oppositional Defiant Disorder (ODD), PTSD, and self-esteem problems. (Tr. 408). Ms. Henderson noted Plaintiff was not in any imminent danger to self or others, and prescribed medication for anxiety and ADHD with a stated goal of improving mood with medication. (Tr. 407-08). She also stated: "trend of stabilization noted." (Tr. 408).

---

2. Although it is noted that Plaintiff saw a therapist weekly, the transcript contains no therapy records.

*Opinion Evidence*

In late August and early September 2012, a team[3] reviewed Plaintiff's record on behalf of the state agency and concluded Plaintiff's symptoms did not functionally equal a listed impairment. (Tr. 79-88). They concluded Plaintiff had less than marked limitations in the domains of: 1) acquiring and using information, 2) health and physical well-being and 3) attending and completing tasks (with the psychologist citing preschool attention problems). (Tr. 84-85). They found no limitation in moving about and manipulating objects, *id.*, and no limitation in caring for self, with the pediatrician citing a June 2012 school report that Plaintiff scored 100, the "Average for adaptive behavior" on the Developmental Assessment of Young Children ("DAY-C") (Tr. 85). Finally, they concluded Plaintiff had a marked limitation in interacting and relating to others due to aggressive behavior with peers and her inability to sit next to a child without touching, talking, or hitting. (Tr. 84).

In October 2012, a new team[4] reviewed Plaintiff's records on reconsideration for the state agency, and again concluded Plaintiff's symptoms did not functionally equal a listed impairment—reaching the same conclusions in each domain. (Tr. 90-98).

**Education Records**

Plaintiff underwent an evaluation by the Cleveland Municipal School District in July 2012. (Tr. 150-67). Plaintiff was referred by Clark due to aggressive behavior toward others and "social/emotional" problems. (Tr. 151). Clark reported Plaintiff "is unable to sit next to a child without touching, talking or hitting them"; and that she "is unable to stay focused". (Tr. 152).

---

3. The team consisted of Lisa Lynch, M.A., CCC, speech language pathologist; Tonnie Hoyle, Psy.D., psychologist; and Janice Taylor, M.D., pediatrician. (Tr. 85).

4. This team consisted of Melissa Hall, M.A., CCC, speech language pathologist; Mel Zwissler Ph.D., psychologist; and Malika Haque, M.D., pediatrician. (Tr. 95).

Clark also filled out a questionnaire noting Plaintiff was able to eat and drink independently, dress herself, was not potty trained, and needed supervision for many activities. (Tr. 154). The evaluation concluded Plaintiff had suspected disabilities of emotional disturbance and "developmental delay (preschool)". (Tr. 157). Plaintiff was evaluated by an occupational therapist, physical therapist, and speech pathologist. (Tr. 160-61). The occupational therapist noted Plaintiff "did demonstrate adequate behaviors and the ability to listen to all directives . . . approximately 75% of the time on the first trial." (Tr. 160). Plaintiff also initially stated "I can't" when asked to complete a task, but after encouragement, successfully completed the task. *Id.* Standardized occupational therapy testing (DAY-C) showed Plaintiff was within the average standard score range, at the 58th percentile. *Id.* The evaluator also noted Plaintiff "was able to sit for two periods of 10 minutes without difficulty", and was able to successfully complete tasks related to cutting, coloring, and completing puzzles. *Id.* The evaluator noted Plaintiff's "fine motor and attention and behavioral skills are developing in an age-appropriate range of a student/child her age." *Id.* Plaintiff's mother reported Plaintiff can dress herself, including zipping and unzipping her coat. *Id.*

Plaintiff scored below average on a different DAY-C domain, falling into the 12th percentile. (Tr. 161). Notes on this score indicate Plaintiff does not follow class rules, talks back to Clark, is physical with other children at school, has difficulty sharing, and difficulty transitioning between activities. *Id.*

An evaluator also observed Plaintiff was "absorbed playing with items in the play kitchen area." *Id.* She had a tendency to interrupt adults, and had difficulty following redirection to stop interrupting. *Id.* "At times she turned to her mother to let her know what she was playing or that she was leaving the room to partake in part of the assessment with another examiner." *Id.*

Plaintiff was so "engrained in imaginary play" that she did not answer questions posed to her by the school psychologist. *Id.* Her adaptive behavior DAY-C score was average, at the 50th percentile. *Id.*

The evaluator suggested implementing a reward system to reinforce positive behaviors, and working on following directions and rules, as well as sharing and taking turns with other children. *Id.* The evaluator also noted Plaintiff would benefit from a "structured preschool classroom where behavior management skills are incorporated into the curriculum." *Id.* The evaluation concluded Plaintiff was eligible for special education services due to a developmental delay in the area of social-emotional and behavioral skills. (Tr. 166).

Based on the evaluation report, an individualized education plan ("IEP") was developed for Plaintiff through the Cleveland Municipal School District. (Tr. 182-92). The IEP noted Plaintiff would need "consistent behavioral support, routines, and expectations best served in a low teacher to student ratio classroom in a single classroom learning environment." (Tr. 190).

In April 2013, Plaintiff's IEP was reviewed. (Tr. 242-70). It reported Plaintiff had made progress on her IEP goal in the area of behavior and compliance in a special education preschool program. (Tr. 243). The class was small—no more than eight students, and 2 adults. *Id.* When given a routine two-step direction, she followed directions 86% of the time; when becoming upset, she followed two-step directions to cope with her feelings about 72% of the time, and when given a one-step non-routine direction during a structured activity, she followed directions 87% of the time. *Id.*

The IEP review noted concerns regarding her social and emotional development. (Tr. 244). Plaintiff was suspended from day care and had been written up on the bus for inappropriate behavior. *Id.* She "play[s] cooperatively at times but needs many reminders to share, takes turns,

7

keep a quiet voice, use nice words, etc." *Id.* Plaintiff was noted to seek attention throughout the day "almost constantly" but with a small class size "she is able to receive the attention she requires, making her successful in this setting." *Id.* The form noted she "displays good effort, completes tasks in a good amount of time and independently, follows directions, is able to dress independently, and is responsible about taking care of materials and cleaning up." *Id.* Plaintiff was noted to be "bright and academically right on track. Relative to other students her age, [Plaintiff] shows age expected skills" in acquiring and using knowledge. (Tr. 245). There was still concern for Plaintiff's "social-emotional well being" based on her need for help calming down after getting excited or upset, and difficult or aggressive behaviors in the classroom. *Id.* Plaintiff's score on the ADHD problems scale was in the "borderline clinical range." (Tr. 262). On observation, Plaintiff's "behaviors were significantly different than typical peers" and "required more verbal direction and repetition of directions and prompting than peers." *Id.* Based on the evaluation, Plaintiff continued to qualify for an IEP based on an educational disability of emotional disturbance. (Tr. 266).

Plaintiff's IEP was again reviewed in April 2014. (Tr. 324-35). Plaintiff was noted to be on track academically, but still having difficulty with following directions and disruptive behavior. (Tr. 326). She was noted to "roll her neck[], eyes, and ignore the adult speaking regardless of who it is." *Id.* When she cooperates and participates in learning, she does well, but when she has to work independently, she "often complains" or does "sloppy" work. (Tr. 327). The IEP evaluation noted that "[d]ue to the intensity and frequency of her poor classroom behavior such as yelling, becoming violent toward peers, rude comments toward peers and staff", Plaintiff needed to remain in a smaller classroom. (Tr. 333). She could, however, participate in art, music, gym, reading, math, and media with her non-disabled peers. *Id.*

***Hearing Testimony and Personal Background***

Plaintiff was born December 1, 2007, making her four years old at her alleged onset date, and five years old at the time of the ALJ hearing. (Tr. 50). On September 5, 2013, Clark and Plaintiff testified at a hearing before an ALJ. (Tr. 36-77). Plaintiff lived at home with Clark. (Tr. 55).

Clark testified Plaintiff does not get along with other children. (Tr. 53). She testified Plaintiff needs to get her way, both at school and at home. (Tr. 54). Plaintiff's father was incarcerated, but had been released to a halfway house. (Tr. 55). When not in school, Plaintiff is either in day care or with a family member (her great-grandmother). (Tr. 56). Plaintiff is aggressive at home and school. (Tr. 58).

Clark described a typical morning as: "She'll get up, she'll brush her teeth, wash her face[.] I have to constantly tell her go brush your teeth, go wash your face, brush your teeth, go wash your face. Or if she usually in bed I tell her to go take a shower, go wash up." *Id.* Sometimes she needs help getting dressed, sometimes she does it herself. (Tr. 59). Clark then takes Plaintiff to school and sits with her while she eats breakfast. *Id.*

During the previous school year, Clark received numerous calls from the school regarding Plaintiff's unsafe behavior. (Tr. 60-61). As a result, three or four times during the school year, she was required to keep Plaintiff out of school for a day or two. (Tr. 61). Clark testified Plaintiff said she did not have any friends during the previous year, but during the current school year says she does. (Tr. 62). Plaintiff plays in the neighborhood with friends, but has gotten into altercations with some children there as well. *Id.* Clark testified she thought because Plaintiff's previous classroom had more boys than girls and there was "a lot of hitting and . . . fighting", Plaintiff "picked up on that habit". (Tr. 63). Clark testified Plaintiff gets good

feedback regarding her learning, but has behavioral difficulties and a short attention span. (Tr. 63-64). Clark testified she can ask Plaintiff to clean her room but has to "stay on her" and "more than likely I'm either helping her or she'll do it, but it'll take time." (Tr. 73).

Clark testified Plaintiff had been given a new diagnosis in June or July 2013—emotional disturbance—severe behavioral handicap. (Tr. 52). She said there was discussion between this or ADHD as a diagnosis. (Tr. 64). Plaintiff was not on any medication at the time of the hearing, but Clark was considering it "if it gets out of control." (Tr. 64). Clark testified Plaintiff has tantrums once or twice a day, and more on the weekends when she is not in school. (Tr. 70-71).

Plaintiff also testified at the hearing. (Tr. 66). She said her new school is "kind of amazing" and "fun" and she has friends. *Id.* Plaintiff stated she did not have trouble getting along with other people at school, but acknowledged she likes to have things her way. (Tr. 68-69).

### *ALJ Decision*

In a written decision, the ALJ concluded Plaintiff had severe impairments of asthma, disruptive behavior disorder, and PTSD. (Tr. 23). He noted she had a history of developmental delays, eczema, and allergic rhinitis, but because they no longer caused more than minimal limitation, they were non-severe. *Id.* He then found Plaintiff did not have an impairment of combination of impairments that meet or equal a listed impairment, specifically considering listings 112.02 regarding Plaintiff's PTSD and disruptive behavior disorder, 112.06 regarding anxiety disorders, and 112.08 regarding personality disorders. *Id.* The ALJ then concluded Plaintiff did not have an impairment or combination of impairments that functionally equals the severity of the listings because she only had one "marked" limitation—in interacting and relating with others—and less than marked, or no limitation, in the other functional domains. (Tr. 23-31). Therefore, the ALJ found Plaintiff not disabled. (Tr. 31-32).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). For claimants under the age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine if a claimant is disabled:

    1.    Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

11

2.     Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3.     Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. *Id.* § 416.926a(a).

A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). "It is the equivalent of functioning [one] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.* An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). The six functionality domains are: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for yourself, and 6) health and physical well-being. *Id.* § 416.926a(b)(1). In determining functional equivalence, the ALJ must consider the "whole child." Social Security Ruling 09–lp, 2009 WL 396031, at *2.

**DISCUSSION**

Clark raises two objections to the ALJ's decision: 1) the ALJ failed to articulate why Plaintiff did not have a marked restriction in the domains of caring for self and attending and completing tasks in violation of SSR 09-7p; and 2) the ALJ erred in failing to find that Plaintiff had a severe impairment of ADHD.  The Commissioner argues the ALJ's decision is supported by substantial evidence, and any error regarding ADHD is harmless.

*Functionality Domains*

*Caring for Yourself*

Clark first contends the ALJ erred in not finding Plaintiff had a marked limitation in the domain of caring for oneself. She contends this is so because the ALJ did not consider Plaintiff's ability to care for her *emotional* in addition to *physical* needs as required by SSR 09-7p. The Commissioner responds that the ALJ correctly determined no limitation in this domain because the ALJ cited to a checklist of tasks Clark indicated Plaintiff could do, and gave considerable weight to the opinion evidence.

The "caring for yourself" domain includes "how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area." 20 C.F.R. § 416.926a(k); *see also* SSR 09-7p, 2009 WL 396029. The regulation provides, regarding preschool-aged children:

> You should want to take care of many of your physical needs by yourself (e.g., putting on your shoes, getting a snack), and also want to try doing some things that you cannot do fully (e.g., tying your shoes, climbing on a chair to reach something up high, taking a bath). Early in this age range, it may be easy for you to agree to do what your caregiver asks. Later, that may be difficult for you because you want to do things your way or not at all. These changes usually mean that you are more confident about your ideas and what you are able to do. You

13

should also begin to understand how to control behaviors that are not good for
you (e.g., crossing the street without an adult).

20 C.F.R. § 416.926a(k)(2)(iii). The SSR expands on what constitutes typical functioning in this

domain for a preschool-aged child, including "tries to do things that [s]he is not fully able to do";

"agrees easily and early in this age range to do what caregiver wants, but gradually wants to do

many things her own way or not at all"; "develops more confidence in abilities"; and "begins to

understand how to control behaviors that are potentially dangerous (for example, crossing street

without an adult." SSR 09-7p, 2009 WL 396029, *5.

The SSR also discusses expressing emotional wants and needs. It explains that

Children must learn to recognize and respond appropriately to their feelings in
ways that meet their emotional wants and needs; for example, seeking comfort
when sad, expressing enthusiasm and joy when glad, and showing anger safely
when upset. To be successful as they mature, children must also be able to cope
with negative feelings and express positive feelings appropriately. In addition,
after experiencing any emotion, children must be able to return to a state of
emotional equilibrium. The ability to experience, use, and express emotion is
often referred to as self-regulation. Children should demonstrate an increased
capacity to self-regulate as they develop.

*Id.* at *3.

Examples of limited function in caring for yourself (although such examples do not

necessarily show marked or extreme limitation) include: 1) putting inedible objects in the mouth;

2) using self-soothing activities that show developmental regression (e.g., thumbsucking, re-

chewing food) or have stereotyped mannerisms (e.g., body rocking, headbanging); 3) not

dressing or bathing self appropriately for age; 4) engaging in self-injurious behavior (e.g. self-

inflicted injury or refusal to take medication), or ignoring safety rules; 5) not spontaneously

pursuing enjoyable activities or interests; or 6) disturbance in eating or sleeping patterns. 20

C.F.R. § 416.926a(k)(3)(i)-(vi). As examples of children whose impairments affect the ability to

regulate their emotional well-being, the SSR provides two examples: 1) "A child with an anxiety

14

disorder may use denial or escape rather than problem-solving skills to deal with a stressful situation"; and 2) "A child with attention-deficit/hyperactivity disorder who has difficulty completing assignments may express frustration by destroying school materials." SSR 09-7p, 2009 WL 396029, *3.

Here, the ALJ concluded Plaintiff had no limitation in the domain of caring for yourself. In support, he stated: "Ms. Clark reported that the claimant had generally age appropriate personal skills [citing Tr. 203]. She had difficulties with wetting herself through the age of four [citing Tr. 153]." (Tr. 31). The first record cited by the ALJ shows Clark indicated Plaintiff: eats with a fork and spoon, dresses herself with and without help, washes or bathes without help, and brushes teeth with and without help. (Tr. 203).

Clark argues the ALJ failed to consider the evidence of record regarding Plaintiff's tantrums, aggressiveness with peers, wetting herself, and attention seeking behavior. Clark contends the ALJ "ignored the whole section of emotional wants and needs in his decision and focused, it seem, only on the physical aspect of the child's condition." (Doc. 18, at 9). Defendant responds that the ALJ appropriately addressed these limitations in the domain of interacting and relating to others and his conclusion in the "caring for yourself" domain is supported by substantial evidence.

Preliminarily, the undersigned notes that an ALJ is not required to discuss every piece of evidence in the record as long as he considers the evidence as a whole and reaches a reasoned conclusion. *Boseley v. Comm'r*, 397 F. App'x 195, 199 (6th Cir. 2010); *see also Daniels v. Comm'r*, 152 F. App'x 485, 489 (6th Cir. 2005) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.").

First, the ALJ appropriately cited Plaintiff's previous difficulties with wetting herself. This indicates that while Plaintiff may previously have had difficulty in this area of caring for herself, she no longer did. *See Deloach v. Comm'r*, 2014 WL 533591, at *14 (S.D. Ohio) (finding a claim of functional disability undermined by improvement demonstrated in treatment notes).

Second, "[a] decision about which domain is appropriate for the evaluation of a specific limitation depends on the impact of the particular behavior." SSR 09-7p, 2009 WL 396029, at *4. The regulation discusses the difference between the domains of "caring for yourself" and "interacting and relating with others". Caring for yourself involves "a child's feelings and behavior in relation to self", while interacting and relating with others involves "a child's feelings and behavior in relation to other people." *Id.*

Here, the behaviors Plaintiff points to are primarily directed at others, rather than herself—seeking constant attention, having tantrums when not getting her way, and becoming aggressive with her peers and others. As stated in the SSR, the domain of "caring for yourself" does not "concern the ability to relate to other people." *Id.* One example provided distinguishes between the two domains:

> If a girl with hyperactivity impulsively runs into the street, endangering herself, we evaluate this problem in self-care in the domain of "Caring for yourself." On the other hand, if she interrupts conversations inappropriately, we evaluate this problem in social functioning in the domain of "Interacting and relating with others."

*Id.* Based on this explanation, the undersigned cannot conclude that the ALJ erred in not considering the cited behaviors under the domain of caring for yourself. *See Hawthorne v. Colvin,* 2014 WL 2920811, *5-6 (N.D. Ohio) (adopting report and recommendation stating an ALJ did not err in evaluating a minor claimant's "aggression, bullying, fighting, and disrespectful behavior" under the domain of interacting and relating with others instead of caring

for oneself"). The *Hawthorne* court also noted that if aggression and disrespectful behavior were evaluated under both interacting and relating with others and caring for self, "a finding of marked impairment in the area of interacting and relating with others would necessarily trigger a finding of marked limitations in the area of caring for oneself, thereby undermining the regulatory scheme" where two marked limitations equals disability. *Id.* at *6.

Many of the records cited by Clark do not contradict the ALJ's finding. For example, Clark cites the 2012 Mental Health Assessment by Beech Brook. (Tr. 168). The assessment notes "extreme tantrums, aggressive with peers, wets herself, is disruptive in school, and has difficulty with transitioning from one activity to another." *Id.* The behaviors described, however, are described primarily in relation to others. For example: "she has frequent tantrums especially when she can't get her way"; "[s]he is assaultive toward her peers and parent"; and "when parent gave a simple directive, 'wait', [Plaintiff] became aggressive and angry with parent." *Id.* Clark also argues the ALJ erred in citing the form Clark submitted showing Plaintiff can take care of her personal hygiene, without recognizing that form also indicates she becomes aggressive when others help her. Again, "[a] decision about which domain is appropriate for the evaluation of a specific limitation depends on the impact of the particular behavior." SSR 09-7p, 2009 WL 396029, at *4. The impact of these behaviors is primarily on *others*, not on Plaintiff herself. Additionally, it appears the state agency reviewing physicians had this report and still concluded Plaintiff had no limitation in caring for self. Thus, the ALJ did not err in failing to address evidence such as this under the domain of caring for others.

The ALJ's analysis was brief, to be sure. However, at the beginning of his functional equivalence analysis, he gave "considerable weight" to the October 2012 state agency reviewing experts. (Tr. 25). These experts reviewed records from Beech Brook, Cleveland Municipal

Schools, and Plaintiff's pediatrician (Tr. 91-92), and also concluded Plaintiff had no limitation in this functional domain, citing her average score on the adaptive behavior DAY-C (Tr. 94). State agency reviewing medical sources are highly skilled medical professionals who are experts in Social Security disability evaluation. 20 C.F.R. § 1527(e)(2)(i). Although these sources did not have all of Plaintiff's records, their evaluation does provide support for the ALJ's conclusion.

Although Clark also points to evidence with which the ALJ could have reached a different conclusion in the "caring for yourself" domain—evidence about Plaintiff's abilities to appropriately manage her emotions—the question for the Court is whether the ALJ's conclusion is supported by substantial evidence. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). Given the evidence discussed above, the undersigned concludes the ALJ did not err in his evaluation of this domain, and his decision falls with the "zone of choice" allowed by the substantial evidence standard.[5]

---

5. This case is distinguishable from *Kump v. Commissioner of Social Security*, where the court explained:

> Previous cases have found that non-specific cites to exhibits are insufficient to show the "reasons or basis" for an ALJ's findings where the evidence could also support a different conclusion. *See Burbridge v. Comm'r of Soc. Sec.,* 572 F. App'x. 412, 416 (6th Cir. 2014) (finding general cite to exhibit number insufficient where exhibit contained support for different conclusion as to material issue). The *Burbridge* court explained, "[u]nder these circumstances, a statement of 'the reasons or basis' for the material finding would include a statement of which portions of the exhibit the ALJ relied on and why they supported a finding...." *Id.* (citing *Reynolds v. Comm'r of Soc. Sec.,* 424 F. App'x. [411,] 414 [6th Cir. 2011]).

> In the present case, the ALJ purports to support his conclusions by citing to evidence in the record from various sources; however, the Court cannot ignore that the ALJ failed to specify what information contained in these records he uses (or rejects) in support of his findings. The ALJ's decision provides little more

*Attending & Completing Tasks*

Second, Clark contends the ALJ erred in finding Plaintiff had a less than marked limitation in the attending and completing tasks domain. She contends this is so because the evidence cited is insufficient, and inconsistent with the ALJ's finding of marked impairment in the interacting and relating with others domain. The Commissioner responds that the ALJ's decision is supported by substantial evidence.

The domain of "attending and completing tasks" addresses "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h). For preschool-aged children this means:

> you should be able to pay attention when you are spoken to directly, sustain attention to your play and learning activities, and concentrate on activities like putting puzzles together or completing art projects. You should also be able to focus long enough to do many more things by yourself, such as getting your clothes together and dressing yourself, feeding yourself, or putting away your toys. You should usually be able to wait your turn and to change your activity when a caregiver or teacher says it is time to do something else.

*Id.* § 416.926a(h)(2)(iii). Examples of limited functioning in this area (although such examples do not necessarily describe a marked or extreme limitation) include being: 1) "easily startled, distracted, or overreactive to sounds, sights, movements or touch"; 2) "slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects"; 3) easily "sidetracked from

---

than exhibit numbers and page numbers in support of generalized findings under rote standards.

2015 WL 7774303, at *8 (N.D. Ohio). In one instance, the ALJ simply stated "the evidence in this case shows that the claimant's impairments have caused a 'marked' limitation in this area", and used a string citation to pages in the record. *Id.* Here, although the ALJ's analysis was brief, he explained which records he used to support his conclusion in each domain, as well as the information in that record upon which he relied.

your activities or . . . frequently interrupt[ing] others"; 4) "easily frustrated and giv[ing] up on tasks, including ones you are capable of completing"; and 5) "requir[ing] extra supervision to keep you engaged in an activity." *Id.* § 416.926a(h)(3)(i)-(v). Examples of typical functioning in this domain for a preschool-aged child include: 1) paying attention when spoken to directly; 2) sustaining attention to play and learning activities; 3) concentrating on activities like puzzles or art projects; 4) focusing long enough to complete many activities independently (like getting dressed or eating); 5) taking turns and changing activities when told it is time to do something else; and 5) playing contentedly and independently without constant supervision. SSR 09-4p, 2009 WL 396033, *5.

The ALJ here found Plaintiff had a less than marked limitation in attending and completing tasks, noting:

> Ms. Clark reported that the claimant could only pay attention to television (TV) or other activities for 15 minutes at a time [citing Tr. 203].
>
> School testing in June 2012 showed that the claimant could complete an art project and work independently at midline. She had age appropriate attention and behavior skills [citing Tr. 160].

(Tr. 27). As noted above, earlier in his opinion, the ALJ also gave "considerable weight" to the opinion of the state agency reviewers. (Tr. 25). The reviewing psychologist noted problems with attention in preschool and "inability to stay focused at task", but concluded Plaintiff's limitations were less than marked in this domain. (Tr. 93). Earlier in his opinion, the ALJ also noted he found Clark's allegations on behalf of Plaintiff "less credible" and "the school evidence is given greater weight." (Tr. 26). He stated this was so because "school notes show improvement with special education". *Id.* With this context, the ALJ's reasoning follows—he discounted Clark's report of limited attention span in contrast to the school testing report.

The school testing cited by the ALJ supports his conclusion. The evaluator noted Plaintiff was able to: "sit for two periods of 10 minutes without difficulty", "successfully work independently at midline and use two hands to color, cut, and string beads"; and "complete a four piece wood puzzle." (Tr. 160). Although the evaluation also notes that when asked to complete a seated work task, Plaintiff often initially stated "I can't", she successfully completed the task after "one or two state[ments] to encourage." *Id.* Finally, the ALJ referenced the evaluator's statement that Plaintiff's "attention and behavioral skills are developing in an age-appropriate range of a student/child her age." *Id.*[6]

Clark argues the ALJ must have erred here because in finding Plaintiff had a marked impairment in the domain of interacting and relating with ones, he cited school testing that Plaintiff interrupted adults with make believe play and was "so involved in that play that she would not complete some tasks". (Tr. 28) (Citing Tr. 161). Clark argues it was error to consider this evidence in that domain, but not in attending and completing tasks. While this evidence does provide support for the assertion that Plaintiff had some limitations in this area, the ALJ, notably, did not find Plaintiff had *no* limitation in this domain, but rather that it was *less than marked*. Thus, he acknowledged some limitations, but concluded it did not reach the marked level.

---

6. Clark points out that the record cited by the ALJ also shows Plaintiff interrupted adults during testing, and would not answer questions directed at her by the school psychologist. This is true, however, the ALJ cited the statement in the same document that Plaintiff's "attention . . . [is[ developing in an age-appropriate range." (Tr. 160). Additionally, the state agency reviewers had records from Cleveland Municipal Schools and concluded Plaintiff had less than marked limitations in this area. *See* Tr. 91-92

To be sure, there is also evidence to support Clark's argument[7]—and a contrary conclusion—in the record, but the Court's job is to determine whether there is substantial evidence, that is, "more than a scintilla of evidence but less than a preponderance" such that "a reasonable mind might accept [it] as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030. The undersigned finds such the ALJ's analysis—although brief—satisfies this standard, particularly when coupled with the citation to state agency reviewers earlier in his opinion, and his decision is supported by substantial evidence.

### Failure to Find ADHD Was a Severe Impairment

Clark's final argument is that the ALJ erred in failing to recognize Plaintiff's ADHD as a severe impairment. The Commissioner responds that this was not error based on the record, and, even assuming it was, any such error is harmless.

Step Two (determining severe impairments) is a threshold inquiry and not a high hurdle for a claimant to clear: "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir. 1988); *see also Despins v. Comm'r of Soc. Sec.,* 257 F. App'x 923, 929 (6th Cir. 2007). It remains, however, that an ALJ's error in excluding an impairment as "severe" at step two is not harmful so long as the ALJ finds another severe impairment, continues with the five-step analysis, and accounts for all impairments, both severe and non-severe, at the subsequent analytical steps. *See, e.g.*, *Swartz v. Barnhart,* 188 F. App'x

---

7. The undersigned also notes that several of the records Clark refers to in support of her argument regarding attending and completing tasks are statements made *by* Clark *to* physicians or school officials by Clark herself. *See, e.g.,* Tr. 152, 407, 410. As discussed above, the ALJ noted at the beginning of his functional equivalence analysis that "Ms. Clark's allegations on behalf of her daughter are found less credible, and the school evidence is given greater weight." (Tr. 25).

361, 368 (6th Cir. 2006); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that [claimant] had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence."). Here, the ALJ found severe impairments of asthma, disruptive behavior disorder, and post-traumatic stress disorder. (Tr. 23). He then considered those impairments in comparison to listed impairments (including 112.02 (organic mental disorders), 112.06 (anxiety disorders), and 112.08 (personality disorders)). *Id.* The ALJ then proceeded to consider whether Plaintiff's combination of impairments functionally equaled the severity of the listings. (Tr. 23-31). Accordingly, the Court will assume, without deciding, that the ALJ erred in failing to recognize ADHD as one of Plaintiff's severe impairments.

The ALJ here found other severe impairments, and proceeded to the subsequent analytical steps. He also recognized that ADHD had been brought up when discussing Plaintiff's pediatric records. (Tr. 25) (noting the pediatrician's evaluation and teacher's evaluation were consistent with ADHD and that the pediatrician referred Plaintiff to behavioral health). He did not ignore the evidence of ADHD in the record, but mentioned some of it explicitly. The ALJ also considered the allegations and behaviors consistent with ADHD such as Plaintiff's ability to focus and the IEP's description of Plaintiff's needs.

For these reasons, the undersigned concludes that the ALJ's failure to recognize ADHD as a severe impairment, even if error, was not harmful. This is so because the ALJ's opinion considered Plaintiff's impairments as a whole in finding her not disabled, and that finding is supported by substantial evidence.

**CONCLUSION**

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision to deny SSI supported by substantial evidence. Accordingly the decision of the Commissioner is affirmed.

IT IS SO ORDERED

 s/James R. Knepp II
United States Magistrate Judge